# Edward A. Nixon, Appellee, v. City of Chicago, Appellant.

## Gen. No. 23,780.

1. MUNICIPAL CORPORATIONS, § 941*—*when settling of building shown to be due to construction of tunnel under public alley.* In an action for damage to a building alleged to have been caused by settling, due to the construction of a tunnel under a public alley along one side of such building, evidence *held* to show that the settling of the building was caused by the construction of the tunnel.

2. MUNICIPAL CORPORATIONS, § 941*—*when liable to abutting owners for damages due to construction of tunnel under public alley.* Where a tunnel is constructed under a public alley for a public use, pursuant to authority granted by the municipality and under its supervision and inspection, and such construction causes injury to abutting owners, the city will be liable for the damages sustained.

3. MORTGAGES—*what are rights of assignee of master's certificate of sale as to recovery for injury to leasehold.* The assignee of the master's certificate of sale on foreclosure under a trust deed on a leasehold interest has such an interest in the leasehold as to entitle him to recover for damage to the property caused by the negligent construction of a tunnel in an alley alongside the premises, although the damage was inflicted prior to the receipt of the master's deed.

4. EVIDENCE, § 134*—*when sufficient foundation laid for admission of certified copies of deeds and leases to show ownership.* Certified copies of deeds and leases introduced to prove ownership, *held* not erroneously admitted on testimony of the plaintiff and others that the originals were not in his possession, power or control, and that none of them had been intentionally destroyed or disposed of by him, although a more accurate compliance with Rev. St. ch. 30, sec. 36 (J. & A. ¶ 2268), would require testimony that to the best of his knowledge the originals had not been intentionally destroyed or in any manner disposed of by him or by anybody else.

5. EVIDENCE, § 88*—*when admissible as to effect on buildings of construction at other places of tunnels in alleys.* Where an alleged cause, such as the construction of a tunnel in an alley causing the settling of an abutting building, has operated elsewhere, under similar conditions, the results are admissible in evidence,

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

and the circumstances in the instances compared need not be precisely the same as those involved in the case in which such evidence is offered, but it is sufficient if they correspond in essential respects.

6. TRIAL, § 46*—*what does not constitute expression of opinion on answer as evidence.* Comments by the court, in overruling motions to strike, that "The answer amounts to an answer to the question," and that "It is, in effect, an answer, as I get it," do not constitute an expression of opinion by the court as to the truth of the answer or its weight or value as evidence, or as to any fact in issue.

7. TRIAL, § 46*—*what latitude allowed trial court in giving reasons for rulings on evidence.* While remarks of the trial court, made to the jury and having the force of an instruction, or made in the presence and within the hearing of the jury, and expressing an opinion as to the value of the evidence or in relation to some facts in evidence or at issue, may be ground for reversal, the trial court may properly give his reason for rulings upon evidence, and he should be accorded reasonable latitude in so doing.

8. MUNICIPAL CORPORATIONS, § 941*—*when instruction on right not to have property taken for public use without just compensation is proper.* In an action against a city for damage to a building abutting on an alley, caused by the construction of a tunnel in the alley for a public purpose, pursuant to authority granted by the city and under its supervision and inspection, an instruction on the constitutional protection of the owner of property from being damaged for a public use without just compensation is proper.

9. MUNICIPAL CORPORATIONS, § 942*—*when instruction not erroneous because ignoring question of due care by abutting owner of damaged building.* An instruction upon the liability of a city for damage to a building abutting on an alley, caused by the construction of a tunnel in the alley for a public use, pursuant to authority granted by the city and under its supervision and inspection, is not erroneous because it ignored the question of due care on plaintiff's part, where no issue of contributory negligence was presented in the trial court.

10. APPEAL AND ERROR, § 1236*—*what inconsistent position may not be taken on appeal.* Where, in an action against a city for damage to a building caused by the construction of a tunnel in an abutting alley, defendant tried the case upon the theory that the construction of the tunnel had nothing whatever to do with the damage to the building, it cannot on appeal take the inconsistent position that the judgment should be reversed for failure of the court to submit the question as to whether plaintiff, in the exercise of due care, could not have prevented the damage.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Nixon v. City of Chicago, 212 Ill. App. 365.

**11.  ADJOINING OWNERS, § 1\*—*when common-law rule as to lateral support of building inapplicable.*** The common-law rule, that while an owner must support the soil of an adjoining owner in its natural state he is not bound to support buildings thereon, has no application under the Constitution of 1870 to operations conducted in a public street, under the authority, control and inspection of the city, causing damage to a building by the removal of lateral support.

**12.  MUNICIPAL CORPORATIONS, § 942\*—*when instruction on contributory negligence of abutting owner constructing foundations of building in alley properly refused.*** In an action against a city for damage to a building caused by the removal of lateral support in the construction of a tunnel in an abutting alley, an instruction that the owner of the building had no right to locate and maintain its foundation in the alley, and if the damage would not have been caused except for that, such owner was guilty of contributory negligence barring recovery, was properly refused where there was no evidence that the city had not consented to the location of the foundations in the alley, but on the contrary indicated a license by the city.

**13.  RELEASE, § 22\*—*when city not released from liability for damage to building by removal of lateral support in alley.*** A covenant not to sue executed on settlement with the receivers of a contractor who constructed a tunnel in an alley causing damage to plaintiff's building by the removal of lateral support was not a release or accord and satisfaction as to the city authorizing and supervising the construction of the tunnel, the covenant expressly reserving all rights against the city.

**14.  ACCORD AND SATISFACTION, § 8\*—*what not competent evidence of as to another joint tort-feasor.*** The master's report and the opinion of counsel representing the receivers in receivership proceedings involving the settlement of a claim against the receivers for the negligence of a joint tort-feasor and the execution to the receivers of a covenant not to sue are incompetent upon the question as to whether the transaction constituted an accord and satisfaction as to another joint tort-feasor.

**15.  RELEASE, § 21\*—*when release of joint tort-feasor preventing action over does not release cojoint tort-feasor.*** Where pending the settlement of a claim against the receivers of a contractor whose negligence was alleged to have caused damage to plaintiff's building by the removal of lateral support in the construction of a tunnel in an abutting alley, with the authority of the city and under its supervision, the court set aside a fund of $250,000 to protect the claimant and upon settlement with the receivers for the sum of $50,000 and the execution by claimant of a covenant not to

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

sue, reserving all rights against the city, released the balance of the fund and discharged the receivers, the city could not contend that the settlement should be construed as a release as to it, as the release of the fund and the discharge of the receivers prevented an action over by it, since the acts complained of were not acts of the plaintiff but of the court.

Appeal from the Circuit Court of Cook county; the Hon. KICK-HAM SCANLAN, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1917. Affirmed. Opinion filed October 16, 1918. Rehearing denied November 7, 1918. *Certiorari* denied by Supreme Court (making opinion final).

SAMUEL A. ETTELSON, for appellant; FRANK S. RIGHEIMER and GEORGE A. CURRAN, of counsel.

TOLMAN, REDFIELD & SEXTON, for appellee; EDGAR BRONSON TOLMAN, of counsel.

MR. JUSTICE THOMSON delivered the opinion of the court.

This was an action wherein the appellee, Edward A. Nixon, hereinafter referred to as the plaintiff, sought to recover damages alleged to have been caused by the construction of a branch tunnel in the alley immediately south of the Unity Building in the City of Chicago, under a permit issued by the appellant, the said City of Chicago, hereinafter referred to as the defendant. A trial was had before a jury and the verdict returned, found the issues for the plaintiff and assessed his damages at the sum of $100,000. Judgment for that amount followed, from which the defendant has appealed.

One of the chief contentions of the defendant is that the verdict is against the weight of the evidence.

The Unity Building is located on Dearborn street in the City of Chicago. It has a frontage of 80 feet on that street and a depth of about 120 feet. The south wall of the building adjoins an 18-foot alley. There is a tunnel in Dearborn street approximately 45 feet below the center of the street, which is a part

of the system of tunnels constructed by The Illinois Tunnel Company. The branch tunnel in question extends from this Dearborn street tunnel, in an easterly direction under the center of the alley adjoining the Unity Building, to a point 105 feet east of the center line of Dearborn street where it curves to the south and passes under a building located immediately to the south of the alley. This tunnel then leads up into the basement of the latter building, known as the Chemical Bank Building, where it terminates. The permit for the construction of this branch tunnel was issued by the defendant on June 11, 1910. Work on the tunnel was begun June 21, 1910, and it was completed July 6, 1910. The work was done by gangs working in three shifts of 8 hours each. Except for a few feet immediately contiguous to the main tunnel in Dearborn street, the branch tunnel passed through a stratum of clay which was removed by means of drawknives. It has inside dimensions of $4\frac{1}{2}$ by 6 feet. It is of concrete construction, the walls being approximately 15 inches thick at the bottom and 10 inches at the sides and top. In building the tunnel, the clay was excavated for a distance of about 3 feet at a time. After each 3 feet was excavated, a concrete floor slab was laid. Forms were then erected and steel laggings placed outside of these, giving the proper inside dimensions, leaving a space of approximately 10 inches between the laggings and the walls of the excavation. Concrete was shoveled in behind these laggings and tamped, laggings being added one above the other until they approached the key of the arch. Here a centerpiece was put in position on top of the forms and the excavation was carried forward at the top a sufficient distance to permit concrete to be shoveled in between the top form and the top of the excavation and tamped into place. The construction of each such 3-foot unit occupied about 8 hours. The bottom, top and sides of the excavation were unsup-

ported except as the concrete was put in place and the face of the excavation was always without support. Compressed air was not employed.

The plaintiff had no notice of the construction of the tunnel and of course took no steps to protect his foundations. He was the owner of a leasehold estate comprising the Unity Building and the ground it occupied. The nature of his estate will be referred to further in connection with another feature of the case. The contractor who built the branch tunnel put the Chemical Bank Building, or parts of it, on jacks at the time of the tunnel construction.

The Unity Building was built in 1891-1892 and rested on what is known as a "floating foundation." Its foundation columns rested upon slabs made of concrete and steel bars. There were fifty such slabs located at about city datum and 16 feet apart, center to center.

The alleged damage to the building consisted in a material settlement along the south wall and particularly at the southwest corner, resulting in a tipping in that direction, which ultimately made it necessary to put the building up on jacks and build concrete caissons down to bedrock, under the south wall.

It was the contention of the plaintiff at the trial, that the settlement and tipping of the building was the direct and immediate consequence of the construction of the tunnel in the alley. On the other hand, the defendant contended that it was caused by defective foundations and that the south row of footings was inadequate to bear the weights imposed upon them.

This was the issue of fact presented to the jury. By their verdict the jury found that the proximate cause of the injury complained of by the plaintiff was the construction of the tunnel in question. This finding cannot be set aside on this appeal unless it appears that it is contrary to the clear preponderance of the evidence.

It does not so appear to us.  Testimony was submitted tending to establish, and from it the jury would be warranted in believing and finding, the following facts:

At the time of the construction of the Unity Building caisson foundations were unknown.  The so-called "floating foundation" was a standard foundation for such a subsoil as is to be found under the Unity Building and which is practically the same under all the central part of the City of Chicago.  A building such as the one in question, constructed on such a foundation, will necessarily settle to some extent and ultimately come to rest.  The settling will be a gradually diminishing one.  During its construction in 1891-1892, the Unity Building began to settle.  The rate of settlement of the southwest corner of the building steadily diminished from .031 of an inch per day in the fall of 1891 to .0058 of an inch per day in the spring of 1892.  The northwest corner of the building settled at the rate of .028 of an inch per day in the fall of 1891 and this had diminished to .0073 of an inch per day in the spring of 1892.  At the southeast corner this settlement was .038 of an inch per day in the fall of 1891 and .0116 of an inch per day in the spring of 1892.  In the fall of 1891 the northeast corner was settling at a rate of .0054 of an inch per day and in the spring of 1892 it was .0103 of an inch per day.  It would seem from this that the building was gradually "finding itself."  In the fall of 1892, after the building was completed, the southwest corner leaned to the south 5 inches and the southeast corner 3½ inches. The next survey of the building was made 8 years later, in July, 1900.  At that time the building was found to be leaning to the south 6⅞ inches at the southwest corner and 5 inches at the southeast corner. In that period of 8 years these corners had tipped 1⅞ and 1½ inches respectively.  This would involve a settlement of .84 of an inch at the southwest and

.66 of an inch at the southeast corner. This would be at the rate of .000287 of an inch per day at the southwest corner and .000227 of an inch per day at the southeast corner.

In 1896 a Mr. Grower became the manager of the building. At that time he noticed that the north wall of the Unity Building was about 2 or 3 inches from the top of the south wall of the McCormick Building located immediately to the north. This was at the eighth story of the Unity Building and the space was reduced to nothing at about the third story of the Unity Building. This space had previously been filled with cement and showed a crack along the top which was filled with oakum, very soon after Mr. Grower became the manager. At the same time he had a copper flashing constructed to cover the junction of the two buildings. A sheet of copper was fastened on the top of the McCormick Building fire wall and carried over the edge of that wall and down along its north face. Another sheet of copper was fastened to the north wall of the Unity Building, was brought down to the fire wall of the McCormick Building and extended across the top of that wall, overlapping the sheet of copper first referred to, so that water coming down the Unity Building wall would run onto the roof of the McCormick Building and not between the walls of the two buildings. The overlapping was about 4 inches. In the spring of 1910 this copper flashing was observed and it appeared to be in the same condition as when it was put on.

The work of constructing the branch tunnel began June 21, 1910. On June 26th the excavation reached a point one foot east of the southwest corner of the Unity Building and on the following day it was extended some 10 feet further. On that day a metal door leading to the buffet in the Unity Building on the Dearborn street front was found to be binding, and also on the same day, and for several days follow-

ing, complaints were received from tenants about their doors. It was found that a number of doors in walls running east and west had a tendency to swing open to the south, and those in walls running north and south were binding and sticking—a condition that had never been noticed before. The bowl of a washstand in the buffet, fastened to the wall and the floor, cracked. A belt which connected the steam engine with an electric generator, in the basement, repeatedly flew off. There had been no trouble of this sort previously. The engine was found to be tipping towards the south. It was jacked up and the belt ran all right. Cracks appeared in the mosaic floor of the safety deposit vaults, in the basement, and the large door leading to the vaults jammed. Cracks appeared in the partitions in many of the offices in the southwest part of the building. Mr. Grower, manager of the Unity Building, went into the Chemical Bank Building to see if he could find out what was the matter and he learned of the tunnel construction and found that building being partially supported on jacks. He endeavored to reach the contractor who was doing the tunnel work but did not succeed. About the time the tunnel work was completed it was found that the walls of the Unity Building and the McCormick Building had again separated, pulling the copper flashing apart and causing an opening of several inches at the top of the McCormick fire wall and on the north side of the old wedge which had filled the previous opening. This new opening was filled in with another wedge of brick and mortar or cement.

On July 9, 1910, another survey of the building was made and it was found to be leaning to the south 15⅜ inches at the twelfth story, at the southwest corner, and 8⅝ inches at the southeast corner. A number of surveys were made subsequent to this time. One made in the fall of 1911 showed that the building was leaning to the south 27⅜ inches at the roof at the

southwest corner and 14⅜ inches at the southeast corner. In the fall of 1912 the building was put on jacks and caissons were constructed under four columns at and near the southwest corner of the building, running down to hard pan. After the jacks were removed and the building rested upon the caissons, that part of the building remained stationary, but the part to the east of the caissons continued to settle to some extent. It was the opinion of witnesses testifying on the subject that, in order to insure the safety of the building, it was necessary to put the entire south wall on caissons.

During the construction of the four caissons referred to, the clay under the Unity Building was found to be plastic. It moved after excavation. There was testimony to the effect that similar tunnels built in a similar manner, in the central part of Chicago through clay of this same general character, and contiguous to buildings constructed as the Unity Building was, resulted in a settlement in the foundations and walls and consequent damage to the buildings.

On many of these matters the testimony was conflicting. There was much further testimony which cannot be outlined or commented upon within the scope of this opinion. In finding the facts as given above and coming to the conclusion that the material movement of the Unity Building in the summer of 1910 occurred after the building had reached practically a state of rest and was due directly to the construction of the branch tunnel within a few feet of and 28 feet under the foundations of the south wall of the building, the jury cannot be said to have returned a verdict based on a finding contrary to the clear preponderance of the evidence.

The issue of fact having been thus determined, the liability of the defendant under the law follows. The construction of the tunnel in question was possible under and by virtue of ordinances duly passed by the

defendant city.   The permit to do this particular
work was issued by the city and recited that it was
granted under the ordinances referred to and subject
to all the conditions they contained.   Among these
conditions were provisions that all work done under
the ordinance, and all methods of construction em-
ployed, were to be subject to the approval of the Com-
missioner of Public Works of the city and under his
supervision, and that he should have power to stop
the work whenever the method of construction or ma-
terial used should not meet his approval, or whenever
the work should endanger the property of any person
or corporation.   The city inspected the work through-
out its progress.   It controlled the location of all tun-
nels, under the provisions of the ordinances, and the
permit for this particular tunnel specified its location.
The tunnel was constructed for a public use and was
used to connect the telephone cables of the automatic
telephone system, operated by the Illinois Tunnel Com-
pany in doing a telephone business, with a general
switchboard of the company located in the Chemical
Bank Building.

Where a tunnel is constructed under a public street
and for a public use, pursuant to authority granted
by the municipality and under its supervision and in-
spection, and there is an injury caused to owners of
adjoining property by such construction, the city will
be liable for the damages sustained.   *Stack v. City
of East St. Louis,* 85 Ill. 377; *Barnard v. City of Chi-
cago,* 270 Ill. 27.

In support of its appeal the defendant contended
that the plaintiff had no right of action and was not
the proper party to bring suit, assuming the damage
and liability alleged.

The leasehold in question had been incumbered and
a trust deed executed to secure the debt.   Default hav-
ing been made, foreclosure proceedings were insti-
tuted which resulted in a sale of the leasehold by a

master in chancery. At that sale one McCormick was the purchaser and he received a master's certificate of sale, on June 2, 1909. On June 2, 1910, Nixon, the plaintiff here, purchased the interest of McCormick and took an assignment of the certificate of sale. On September 3, 1910, the plaintiff received a master's deed for the premises. The plaintiff took the master's certificate and later the master's deed, conveying the legal title, as trustee for certain persons who furnished the purchase money for these transactions.

The acts complained of in the declaration, which are claimed to have resulted in the damage therein alleged, occurred after the plaintiff purchased the interest of McCormick in the premises and received the master's certificate of sale from him and before the plaintiff had received his master's deed. At the time the acts complained of were committed, the mortgagor had lost all right of redemption. The legal title to the leasehold, which was the subject-matter conveyed by the trust deed, was still in the trustee. But the plaintiff though not in possession, nor clothed with the legal title, had a substantial interest in the leasehold and such a right to the maintenance of its integrity as gave him a right of action against any one committing any acts resulting in its destruction or damage. If suit had been begun, based on such alleged acts, before the master's deed had been issued to the plaintiff, it may be that it could not have been brought in the plaintiff's name, but that is not the situation presented by the facts of this case and is therefore not before us. When the declaration was filed in the case at bar, the plaintiff had received the master's deed and was possessed of the legal title.

The acts of the defendant here complained of, if established as alleged, were in violation of substantial rights which the plaintiff had at the time the acts were alleged to have been committed, and gave rise

to a right of action on his part to recover the damage resulting to him. *Topping v. Evans,* 58 Ill. 209; *Yates v. Joyce,* 11 Johns. (N. Y.) 136; *Stout v. Keyes,* 2 Doug. (Mich.) 184.

The case first cited was an action on the case brought to recover damages for removing a building from a lot, which premises, the plaintiffs, as judgment creditors of the defendant, had purchased under an execution which had been issued on a judgment. At the time of the removal of the building by the defendant, which was a day or two after the expiration of the time of redemption, the plaintiffs had received the usual certificate, but had not received a deed to the property and, therefore, did not possess the legal title. In that case the court said: "That the plaintiffs were entitled to an action for this wrong, there can be no doubt. They could not maintain trespass, as they were not in possession, nor had they any right of possession. They had, however, a substantial interest in the lot and building upon it, and that has been unlawfully prejudiced by the illegal act of the defendant. The remedy for such a wrong can only be, at the common law, by an action on the case." The court cites as a case in point, *Yates v. Joyce, supra.* In that case the plaintiff did not have title to the property involved. He was not in possession nor did he have the right to present possession, but he had a lien on the property, by virtue of the assignment of a judgment to him by one who had recovered it in an action against the owners.

The declaration alleged that the defendant, with full knowledge of the plaintiffs' rights in the premises, and with intent to deprive them of the benefit of their lien, did demolish and remove certain buildings from the judgment debtor's premises. The court held that trespass would not lie for the plaintiffs were not in possession but that they had a right of recovery against the defendant in an action on the case.

In the case of *Stout v. Keyes, supra,* the plaintiff was assignee of a mortgage executed by the defendant. There was a default followed by a foreclosure and the plaintiff was the purchaser at the foreclosure sale. The declaration alleged that between the time of sale and the expiration of the time for redemption, the defendant, with knowledge of the plaintiff's rights, and intent to injure and prejudice him in his estate, cut down and carried away a large amount of timber growing upon the premises. In holding that the plaintiff could recover, the court said: "It is a general principle of the common law, that whenever the law gives a right, or prohibits an injury, it also gives a remedy by action; and, where no specific remedy is given for an injury complained of, a remedy may be had by special action on the case. * * * In this case, the plaintiff, by his purchase, had acquired an inchoate right to the land, subject to be defeated by payment. * * * If not so redeemed, he had a right to have the estate which he purchased, his title to which would then be consummated."

The principle involved in these cases has recently been approved by our Supreme Court. The case of *Sutherland v. Long,* 273 Ill. 309, was a bill in equity filed by the purchaser of property at a master's foreclosure sale, and the holder of a master's certificate of purchase, by which he sought to have the mortgagor required to repay him the money he had expended for the certificate of purchase and for redeeming a judgment and for taxes, or the master required to execute and deliver to him a master's deed to the premises in question. The incumbrance involved in that case was not a trust deed but a mortgage and the court held that the legal title to the premises remained in the mortgagor during the entire period of redemption, and that by his purchase at the foreclosure sale the complainant had acquired no interest in the title to the land. But the court recognized that: "Pending

redemption proceedings by a judgment creditor, the holder of the certificate of purchase is not stripped of his rights and his interest in the premises.''

On the principles laid down in these cases we hold that the plaintiff, under the facts involved here, was the proper person to bring this suit, and that he may recover for damage to the property in question, and it can make no difference whether such damages are caused by a fraudulent act or a negligent act, or under such circumstances as are here involved.

The plaintiff's ownership of the leasehold estate was proved by competent and sufficient documentary evidence.    This evidence included certified copies of certain deeds and leases.    The defendant objected to their introduction on the ground that proper preliminary proof had not been made.    It appeared from the testimony of the plaintiff and others that the original documents were not in his possession, power or control, and that none of them had been intentionally destroyed or in any manner disposed of by him.    If the testimony of the plaintiff had been to the effect that, to the best of his knowledge, the original documents had not been intentionally destroyed, or in any manner disposed of, either by him or by anybody else, there would have been a more accurate compliance with the provisions of section 36 of chapter 30 of our statutes (J. & A. ¶ 2268).    But the testimony as it is in the record substantially complies with all the requirements of the statute, and the trial court did not err in admitting the certified copies of the documents in question.

The defendant contends that the court erred in admitting the testimony of one Gaiver, concerning movements of the soil caused by the construction of other tunnels in the central district of Chicago.    The evidence in the record is to the effect that the clay is practically the same throughout the downtown district of Chicago.    Where an alleged cause, such as the one in question, has operated elsewhere, under

similar conditions, the results are admissible in evidence. In such cases, the circumstances in the instances compared need not be precisely the same as those involved in the case in which such evidence is offered, but it is sufficient if they correspond in essential respects. The evidence in question was admissible. *Cooper v. Randall*, 59 Ill. 317. It involved results following the building of similar tunnels in a similar manner, in similar soil, contiguous to similar foundations.

The defendant complains of numerous other rulings of the trial court, relating to the admission and the exclusion of evidence. We have considered them all with great care, but it would be impossible to refer to them in detail here. The record of this case is voluminous and the trial of the case was necessarily lengthy. In a long and intricate case it frequently happens that inaccuracies of this sort will occur somewhere in the course of the trial. But such errors should never be made the basis of a reversal of the judgment, unless they have been clearly prejudicial to defendant's case. In our opinion this was not the situation in any of the instances to which our attention has been called. In most of the rulings referred to, the trial court was not in error, and, as to others, it seems to us counsel have been somewhat hypercritical.

Counsel have further strenuously complained of certain remarks made by the trial judge during the course of the trial. On several occasions the court overruled motions, made by the defendant, to strike out answers which the witness had made to questions that had been asked. On one occasion, in overruling such a motion, the court added, "The answer amounts to an answer to the question," and on another, "It is, in effect, an answer, as I get it." Such remarks cannot reasonably be construed as any expression of opinion by the court as to the truth of the answer or its weight or value as evidence or as to any fact in

issue.  As was said by our Supreme Court in *Chicago City Ry. Co. v. McLaughlin,* 146 Ill. 353: "The sufficiency of the answer of a witness is a matter for the determination of the court and not the jury."  We shall not here refer to the numerous other objections that the defendant has urged upon us along this line. In our judgment none of them was prejudicial to the defendant.  While it is true that remarks of the trial court, made to the jury and having the force of an instruction, or made in the presence and within the hearing of the jury, and expressing an opinion as to the value of evidence or in relation to some facts in evidence, or at issue in the case, may be ground for reversal, the trial court may properly give his reason for rulings upon evidence, and he should be accorded a reasonable latitude in so doing.  *Birmingham Fire Ins. Co. v. Pulver,* 126 Ill. 329, 340; *Peoria & F. Ry. Co. v. Barnum,* 107 Ill. 160; *Spohr v. City of Chicago,* 206 Ill. 441, 449; *Hughes v. Richter,* 161 Ill. 409.

The defendant complains of a number of instructions given by the court.  One of them reads as follows:

"The court instructs the jury that the Constitution of Illinois provides that private property shall not be damaged for public use without just compensation. The court further instructs the jury that the use to which the tunnel constructed in the alley adjacent to the Unity Building is devoted, namely, the operation of a telephone system in the City of Chicago, is a public use; that inasmuch as the construction of said tunnel in said alley for said public use was authorized by the City of Chicago, said City of Chicago would be liable for any damage to the Unity Building that was the direct and immediate result of the construction of said tunnel.

"The court by this or any other instruction expresses no opinion on any question of fact in the case."

This instruction is based on the provision of the Constitution protecting the plaintiff from being dam-

aged for a public use without just compensation. This principle applies to a public use which is required or compelled by a municipality, as in *Barnard v. City of Chicago*, 270 Ill. 27; and also to one which is merely permitted, as in *City of Pekin v. Brereton*, 67 Ill. 477; and *Stack v. City of East St. Louis*, 85 Ill. 377.

The defendant further complains of the following instruction:

"The court instructs the jury that whenever a city authorizes work to be done in a public street under the supervision and control of such city, such city becomes liable for any damage directly resulting to adjacent property from the negligent performance of such work in the same manner and under the same circumstances that it would be liable if it performed the work itself. The excavation of the alley and the construction of the tunnel adjacent to the Unity Building were authorized by an ordinance of the City of Chicago, which reserved to the city the right to supervise the work and to stop the work whenever the method of construction or material used should endanger public or private property. If you find from the evidence that such work of excavation and construction was performed under the inspection, supervision and control of the City of Chicago, and if you further find that such work was conducted in a negligent manner as charged in the second count of the declaration, and that damage to the Unity Building resulted directly from such negligence, then the defendant is liable for such damage."

Under all the facts as shown by the record and in view of the authorities cited in connection with the instruction previously referred to, it is our opinion that the giving of this instruction was not error.

The conditions of the ordinance referred to were not disputed. It was not necessary to include in the instruction the elements of the exercise of due care on the part of the plaintiff and his duty to minimize the damages. No such issues were presented in the trial of the case. The defendant did not contend that the

damaging effect of this tunnel construction which it had authorized might have been known by the plaintiff if he had exercised a proper degree of care, or that the taking of proper precautions on his part would have minimized his damages as a result of that construction. The theory on which the defendant tried this case was, that the tunnel construction had nothing whatever to do with the damage to the plaintiff's building. The defendant cannot now take the inconsistent position that this judgment should be reversed because the trial court failed to submit to the jury the question as to whether the plaintiff might not by the exercise of due care have known of, guarded against and minimized the damage caused by the negligent construction of this tunnel—something which the defendant itself insists has no existence. If, as defendant's witnesses swear, the tunnel was constructed properly, and had nothing at all to do with any damage suffered by the plaintiff's property, how could the plaintiff, by any degree of care on his part, have known of it or guarded against it or prevented its results? *United States Rolling Stock Co. v. Wilder,* 116 Ill. 100, 108, 109.

The defendant also complains of an instruction concerning the failure of the defendant to give notice of the excavation to the plaintiff. This complaint is based on the common-law rule that one landowner owes a duty to his neighbor to support the soil in its natural state, but not to support buildings upon it, citing the case of *City of Quincy v. Jones,* 76 Ill. 231. That case is not in point. Since the adoption of the Constitution of 1870, where such an operation in a public street as is involved in the case at bar causes damage to adjoining private property, the city has been held to be liable in damages, the basis of the liability being the interference with the rights of the owner to the full use and enjoyment of his property,

including the building. *Barnard v. City of Chicago, supra*. Where the city permits such a public use of a street, or any space beneath the surface of the street as results in damage to private property, it will be liable for such damage, notwithstanding it may be caused by the withdrawal of lateral support of the weight of a building or other structure on the private property involved.

The defendant has called our attention to a number of other given instructions, contending that the trial court erred in giving them over defendant's objections. What we have said thus far disposes of a number of objections to these instructions, and there are others which are not well taken, but it would serve no purpose to discuss them here. The same thing applies to most of the points raised by the defendant, with reference to instructions submitted by it and modified or refused by the court. One of the instructions submitted by the defendant and refused by the court read as follows:

"The court instructs the jury that the alley south of the Unity Building is a public alley, the fee of which is in the city, and that the owners of the Unity Building had no right to locate or maintain its foundations in part in the alley, and if you find from all the evidence that the injuries complained of would not have been sustained except for the fact that said foundations were in part located in the alley, then you are instructed that the locating or maintaining of said foundations in said alley under such circumstances was such contributory negligence as would preclude the plaintiff from recovering damages against the defendant, providing that you further find from the evidence that the injuries complained of were not inflicted wantonly, recklessly or wilfully."

The refusal of this instruction by the trial court was not error. The foundations of the Unity Building might extend out beneath the surface of the alley, if the city consented to it. There is no evidence in the

record to the contrary, but, such evidence as there is, in any way bearing on the question, would warrant the conclusion that the footings under the south wall of the Unity Building extended out under the surface of the alley by license of the city, for the evidence shows that they had been there undisturbed by the city for a period of nearly 20 years, and in the nature of things they must have been placed there with the city's knowledge and with its express consent, when its stamp of approval was placed on the plans which necessarily showed the precise location of all these footings. Our attention has not been called to any evidence showing or tending to show that the location of these footings beyond the building line affected the settlement, and, in the absence of any such evidence, the giving of the instruction in question would have been error.

It is further contended by the defendant that the trial court erred in excluding evidence relating to a defense of accord and satisfaction, which it sought to interpose, and in restricting counsel in his attempt to present this point to the jury in making his argument. It appears from the evidence that in January, 1912, the Unity Safe Deposit Company filed a petition in the United States District Court against the receivers of The Illinois Tunnel Company, asking the court to direct the receivers to strengthen the foundations of the Unity Building by the construction of caissons under the south wall, and to pay for the damages alleged to have resulted from the construction of the tunnel. The plaintiff in the case at bar, Nixon, and those for whom he was acting, were made defendants to that petition. Nixon filed a disclaimer, stating that at the time of the injury he held the title as a naked trustee for the Unity Safe Deposit Company. Certain *cestuis que trust,* who had furnished the money for the purchase of the property at the master's sale, filed cross petitions. The city was

not a party to these proceedings. While this litigation was pending, the receivers desired to sell certain real estate and were permitted to do so by the court upon condition that they deposit $250,000 to abide the result of the final order or decree to be rendered. This deposit was made and the petitioner's claim and lien were transferred to that fund and removed from all the other property, in the receivership, including the real estate which the receivers desired to sell.

Negotiations for a settlement of the petitioner's claim, so far as the receivers of the Illinois Tunnel Company were concerned, finally resulted in an agreement upon the amount to be paid, which was $50,000. Thereupon counsel representing the receivers asked counsel for the petitioner "about the release," and the latter replied that he preferred giving a covenant not to sue, reserving expressly any and all rights of action there might be against the City of Chicago, the defendant in the case at bar. This was agreeable to the receivers, who thereupon petitioned the United States Court for permission to pay the petitioner in that proceeding $50,000 for a covenant not to sue. The court granted the receiver's petition and entered an order directing the receivers to pay the sum of $50,000 to the petitioner upon the Unity Safe Deposit Company and cross petitioners and Edward A. Nixon (plaintiff here), entering, executing and delivering to the receivers an instrument in writing covenanting and agreeing not to sue said receivers and reserving rights against the City of Chicago, as set forth in the receivers' petition. The money was thereupon paid to the petitioner in that proceeding and a written instrument containing a covenant not to sue and expressly reserving any rights the signers might have against the City of Chicago or any other person or corporation, other than the receivers, signed, among others, by the plaintiff in the case at bar, was delivered to the receivers.

That this did not amount to a release and an accord and satisfaction so as to bar such an action as this, admits of no possible doubt. *Parmelee v. Lawrence,* 44 Ill. 405.

The court in the proceedings in the United States Court directed the receivers of the Illinois Tunnel Company to pay the petitioner in that proceeding $50,000 for a covenant not to sue, after which such a settlement was consummated.

The master's report in that proceeding and the opinion or judgment of counsel representing the receivers there, who was called as a witness in the case at bar, were wholly immaterial and incompetent on the question of whether there had been an accord and satisfaction, and the trial court correctly sustained the plaintiff's objections when such testimony was offered. Nor was the trial court in error in refusing to permit this question to be submitted to the jury. There was no evidence of a release, and none was offered, sufficient to present an issue of fact on this question for the jury, and the trial court could only hold, as he did, that the agreement was a covenant not to sue and did not bar the present action. The defendant urges that the agreement is shown to be a release by reason of the fact that after the $50,000 was paid to the petitioner in these proceedings and the instrument in question was given in consideration of that payment, the balance of the special fund of $250,000 was released and turned over to the Chicago Tunnel Company, which was the purchaser of the entire property from the receiver of the Illinois Tunnel Company, and the receivers were then discharged. It is the contention of the defendant that wherever a settlement is had by a claimant with one of several alleged joint tort-feasors, the others should have the right to maintain an action over against the one with whom such settlement has been made, in case they are sued by the claimant and a recovery is had against them, and

that wherever the settlement made by the claimant with the first joint tort-feasor is such as to take away or destroy the rights of the remaining joint tort-feasors to an action over, in case of an ultimate recovery by the claimant against them, the settlement by the claimant with the first joint tort-feasor should be construed not as a covenant not to sue, but as a release, releasing them all. Whatever may be said as to the soundness of this proposition, it is entirely beside the point involved here. The release of the balance of the fund of $250,000, after the payment of the $50,000 in the proceedings in the United States Court, and the discharge of the receivers there, were not acts of the petitioner in those proceedings nor of the plaintiff here, but of the United States District Court.

We have perhaps omitted to refer to some of the matters which have been urged upon our attention by the defendant in connection with this appeal, but, if so, it was because we deemed them either immaterial or untenable.

Finding no error in the record the judgment of the Circuit Court will be affirmed.

*Affirmed.*