EDWIN L. ARRAS *et al.*, Plaintiffs-Appellees, *v.* COLUMBIA QUARRY COMPANY, Defendant-Appellant.

Fifth District   No. 76-454

Opinion filed September 14, 1977.

Crowder & Associates, Ltd., of Columbia, for appellant.

Jim D. Keehner, Ltd., of Belleville, for appellees.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:

The defendant, Columbia Quarry Company, appeals from a judgment of the circuit court of St. Clair County, awarding damages to Erwin L. Arras and Eleanor M. Arras, landowners in St. Clair County, Illinois, for the loss of water in a well on their property. In their complaint the Arrases had asked for damages for the loss of water in a 165-feet-deep well and for the nuisance created by the quarry company's operations.

Mr. and Mrs. Arras own real estate in St. Clair County, a few miles east of the Village of Dupo, Illinois. The Arrases have lived on the land since 1948. They have a well on their property, working since sometime in the 1800's, approximately 165 feet deep, which provided water for all their needs until August 31, 1972.

The Columbia Quarry Company owns and operates a rock quarry that is approximately one-half mile from the Arrases' property. The quarry company uses explosives in the operation of the quarry, keeping records of information concerning each blasting.

The plaintiffs testified that they were in their home on the afternoon of August 31, 1972. Mrs. Arras was in the kitchen and Mr. Arras was in the living room. Mrs. Arras said that when she first felt the blast the house was vibrating, a cabinet door flew open and a cup fell out. She ran outside and could see the dust from the blast flying up. This blast, she said, was an especially heavy one. She also stated that their well had been working properly that morning but after the blast there was no more water in it. She did not know how the well worked, but did know that her

husband had pulled the mechanism out the day after the blast to check it and that he could find nothing wrong with it.

Mr. Arras testified substantially the same as Mrs. Arras. He said that the evening of the blast the pump was pumping and would not shut off. The next day he checked to see if anything was wrong with the mechanism but found it intact. He put it back and started it again but there still was no water. He put a hose down the pipe alongside the wooden rod that pumps the water and ran water into the well. It immediately started to pump but nothing came up except sludge.

Anna Dugan, a neighbor of the Arrases, testified that on August 31, 1972, about 3:30 p.m., there was a heavy blast and the earth was shaking and a "big smoke came up." She testified further that after the explosion the water in her well, which was 184 feet deep, disappeared and there was a crack in the foundation of her garage.

Adli Watuson, another neighbor, testified that she was fishing in a pond on her property at the time of the explosion on August 31, 1972. She said that she heard the noise from the blast and felt the ground shake. She then saw the smoke rising in the air and was hit by debris from the explosion. Mrs. Watuson further testified that the water in her well, which was 200 feet deep, was muddy and she had to haul water in from elsewhere for a while after the explosion. She said that this happens when there are heavy blasts and that the water is usually clear again within 24 hours. Mrs. Watuson said that after this blast her house had broken windows and cracks in the concrete.

Raymond Dohrman testified concerning the cost of drilling a new well. He stated that he had been in the business of well drilling and pump repair for 15 years. He said it would cost $10 per foot to drill a well and gave an estimate of $5223 based on a well depth of 425 feet. He testified that it would be necessary to drill 425 feet if not deeper to get to water on the Arrases' property. He said he had based his estimate on the depth of other wells in the neighborhood within a half-mile of the Arrases' property.

Harold Thompson who was pit foreman for the quarry company on August 31, 1972, testified concerning the explosives used that day. He said that he maintained a log sheet with respect to the discharge of explosives, and that the log sheet for August 31, 1972, showed that 2400 pounds of explosives were used that day. The explosives were set off in four delays, 25 milliseconds apart, 600 pounds per delay. Counsel for the Arrases asked Thompson if he had ever been involved personally with a violation of any State regulation in a blasting operation. When he said he had not, counsel questioned whether he was not aware of having been fined for violation of State regulations concerning the dust from blasting operations. Mr. Thompson admitted that the quarry company had been

found to be in violation of dust regulations but not in violation of regulations having to do with blasting. Counsel for the quarry company moved for a mistrial on the basis of this line of questioning. The court denied the motion for mistrial but instructed the jury to disregard those questions.

The quarry company called as witnesses six other landowners from the same area in which the Arrases lived. They were questioned about problems with dust from the quarry, interference with the use of their properties, damages to their buildings, and whether or not they could feel the blasts from the quarry. These witnesses could feel the blasts but did not otherwise suffer any adverse consequences. Three of the witnesses were not home at the time of the explosion on August 31, 1972, two could not remember where they were on that date, and one was at home. The one witness who was at home testified that the blast on that day was louder than normal.

Donald Simpson, a safety engineer from the Illinois Department of Mines and Minerals, testified that the amount of explosives used by the quarry company on August 31, 1972, should not have caused any damage to the Arrases' home or well.

John Mathes, a geotechnical engineer, testified concerning water tables and how they may change. He stated that natural changes in the subsurface conditions, which happen often, could have caused the loss of water in the well.

The jury found in favor of the Arrases on the question of the damage to the well and awarded them $9700. They found for the quarry company on the nuisance issue. Judgment was so ordered by the court and the quarry company has appealed from that judgment.

■■ Defendant first contends that the trial court erred in giving plaintiff's instruction No. 11. That instruction was the only one included in the abstract of the record. Error cannot be predicated on the giving or refusal of an instruction unless all of the instructions are set out in the abstract. (*Gillespie v. Norfolk & Western Ry. Co.*, 3 Ill. App. 3d 779, 278 N.E.2d 420; *People v. Robinson*, 27 Ill. 2d 289, 189 N.E.2d 243.) Hence, we will not inquire into this contended error.

Defendant next contends that the trial court erred in refusing to strike the testimony of Raymond Dohrman concerning the cost of drilling a well on the Arrases' property because the testimony was both speculative and irrelevant as to the proper measure of damages.

■■ Upon reviewing Dohrman's testimony as a whole, we are convinced that his estimate of $5223 as the approximate cost of drilling a new well on the property was the result of his expert knowledge, experience, inspection of the Arrases' property and familiarity with the surrounding area rather than mere speculation.

Was Dohrman's testimony relevant? The gravamen of the Arrases' cause of action is that the depletion of the water supply in their well was proximately caused by Columbia Quarry Company's nearby blasting operations. The loss of water in this instance has rendered the well virtually nonproductive. At trial the only evidence concerning damages was Dohrman's estimate of the cost of drilling a productive well to supply the Arrases with the water lost. The quarry company strenuously urges that the only relevant measure of damage is the diminution in fair market value of the property before and after the injury in question. In support of this argument the quarry company cites, *inter alia*, 15 Ill. L. & Prac. *Damages* §143, which states that the measure of damages for injury to realty is ordinarily the difference between the market value of the property immediately before and after the injury. This formula has most often been applied in cases involving injury to buildings and other improvements. *Peck v. Chicago Railways Co.*, 270 Ill. 34, 110 N.E. 414, which criticizes a contrary rule in *Fitzsimons & Connell Co. v. Braun & Fitts*, 199 Ill. 390, 65 N.E. 249; see also *Peet v. Dolese & Shepard Co.*, 41 Ill. App. 2d 358, 190 N.E.2d 613.

A variation of this approach was taken by the court in *Kremeyer v. Shumate*, 20 Ill. App. 2d 542, 156 N.E.2d 271, where it was stated:

"Where the thing which is destroyed or injured, though affixed to the realty, has a distinct value without reference to the real estate upon which it stands, the measure of recovery is for the value or depreciation of value of the thing destroyed or injured, and not for the difference of the value of the land before and after the destruction. Under some circumstances, the proper measure of damages may be the cost of restoration of the property to its condition before the injury occurred, as where the injury is susceptible to be repaired at moderate expense and the cost of restoration may be shown with reasonable certainty. [Citations.]" 20 Ill. App. 2d 542, 546.

On the other hand, where the injury is solely to the land itself, it has been held that the proper measure of damages is the difference in fair market value before and after the injury. *Richards v. Gundlach*, 245 Ill. App. 264.

We have found no Illinois opinion which has attempted to deal with the conflicting results in the many cases or to focus on the peculiar situations which trigger one formula of damages or the other. However, in a profound opinion of our sister State, Indiana, the court in *General Outdoor Advertising Co. v. La Salle Realty Corp.*, 141 Ind. App. 247, 265, 218 N.E.2d 141, 150, endeavored to explain the subtleties of these various measures of damages in the following manner:

"From this analysis, we must conclude that in cases of injury to

real estate or to that which has no value separate and apart from the real estate, the proper measure of damages is as follows: (1) if the injury is permanent, the measure of damages is the market value of the real estate before the injury, less the market value after the injury; (2) if the injury to real estate is not permanent, then the measure of damages is the cost of restoration."

The court then extrapolated these rules and applied them in determining the measure of damages for injury to property attached to but having a separate value from the real estate.

In response to the appellant's protest that should the plaintiff in that case be allowed repair costs when such costs exceed the amount of diminution in fair market value the plaintiff would thereby incur a windfall, the Indiana court reasoned:

"Although this view seems equitable from a defendant's position, it is rather discriminate against a plaintiff. What if a plaintiff does not desire to sell his property? In this posture the effect of the rule would be that where the restoration costs exceed the 'before and after' measure, a plaintiff would receive the latter. Consequently, if he did not desire to sell the building, he would not receive damages sufficient to restore the building to its original condition. The 'before and after' test, if used in cases of non-permanent injury, is in reality forcing the plaintiff to sell the building in order to restore himself to the same position enjoyed before the injury. Certainly such a measure of damages partially compensates a plaintiff for injury done to his building and affords some protection to a part of his property rights. However, it would seem more proper to place the plaintiff in a position where he could be unrestricted in the exercise of his property rights of continued ownership or alienation." 141 Ind. App. 247, 266, 218 N.E.2d 141, 151.

■■ We find the permanent/nonpermanent dichotomy of injuries to realty expounded in this Indiana case to be a logical and well-reasoned statement of the law. We accordingly adopt this approach in this case.

■■ In characterizing an injury to realty as permanent or temporary, a court must necessarily look to the nature of the thing injured. Unlike the damaged structures in *Peck v. Chicago Railways Co.*, 270 Ill. 34, 110 N.E. 414, and *General Outdoor Advertising Co. v. La Salle Realty Corp.*, 141 Ind. App. 247, 218 N.E.2d 141, the instant case is a somewhat unique situation. No structure has apparently been injured; nor has there been damage to the land itself. Rather, the *productivity* of the Arrases' well, *i.e.*, a water source, has been destroyed. However, we do not interpret this to mean that the damage is permanent since it is clear that the injury is abatable. The evidence adduced at trial reveals that the drilling of a new

well on the Arrases' property would almost certainly reproduce the lost source of water. Indeed, the Supreme Court of Arkansas when confronted with the identical fact situation presented here, stated:

> "The jury found, by special verdict, that the injury was temporary, which we interpret to mean that the wells can be rehabilitated *or other wells sunk with good results.*" (*McGeorge v. Henry*, 193 Ark. 443, 445, 101 S.W.2d 440, 441.) (Emphasis added.)

See also Annot., Subterranean Waters, 29 A.L.R.2d 1354, 1378.

Furthermore, we find the cost of repair standard applied in Illinois cases of subsidence due to mining operations persuasive authority for our adoption of that standard in the circumstances of this case. (*Donk Bros. Coal & Coke Co. v. Novero*, 135 Ill. App. 633.) 15 Ill. L. & Prac. *Damages* §143, cited above, provides that:

> "Where the injury is only temporary or where injuries result from subsidence due to mining operations, the cost of repair or restoring the premises is the proper measure of damages."

In its reply brief defendant argues that the Arrases must have considered the injury to be permanent since they offered no evidence as to the cost or restoration of the old well, but simply evidence of the cost of drilling a new well. This argument misconstrues the nature of the real property interest injured—namely, the right to the water rather than the well itself. Nor do we agree with the defendant that the complete transition from well water to city water carried through pipelines is an adequate remedy. To relegate the Arrases to such a drastic alteration in the source of their water would be inequitable at best.

■■ ■ The defendant next contends that the trial court erred in permitting Anna Dugan and Adli Watuson to testify concerning damages to wells on their property and other damages to their property. Anna Dugan testified that the water in her well disappeared after the explosion in the quarry on August 31, 1972, just as the water in the Arrases' well had disappeared. Adli Watuson testified that the water in her well became muddy after the same explosion. In *Nixon v. City of Chicago*, 212 Ill. App. 365, a case involving the results following the building of tunnels it is stated:

> "Where an alleged cause, * * * has operated elsewhere, under similar conditions, the results are admissible in evidence. In such cases the circumstances in the instances compared need not be precisely the same as those involved in the case in which such evidence is offered, but it is sufficient if they correspond in essential respects." (212 Ill. App. 365, 379.)

Thus, evidence of the effect of the same blast on other wells in the vicinity would be admissible. The trial court did not err, then, in admitting this testimony.

Defendant next contends the trial court erred in refusing to grant defendant a mistrial after plaintiffs' attorney suggested that Harold Thompson had been guilty of a violation of the law. Plaintiffs' attorney questioned Thompson repeatedly concerning a violation of State regulations and whether or not he had ever been fined for such a violation of dust regulations, but not for violation of blasting regulations. On direct examination Thompson had been questioned only concerning blasting activities in the quarry. The trial court, after a motion by the quarry company, instructed the jury to disregard this testimony, but refused to grant a motion for mistrial.

■■ Cross-examination of a witness should be confined to matters brought out in direct examination. It is a well-recognized purpose of cross-examination to show matters which affect the credibility of the witness. (*Muscarello v. Peterson*, 20 Ill. 2d 548, 170 N.E.2d 564.) Plaintiffs' line of questioning on cross-examination did not relate to matters brought out on direct examination, nor was it admissible to affect his credibility. However, in view of the fact that the evidence was so overwhelmingly in favor of plaintiffs, we cannot find this questioning so prejudicial to the quarry company as to be cause for reversal.

A final question remains, however, as to the amount of the jury's verdict. The only evidence offered by either side regarding the extent of damages was the estimate of Dohrman that to drill a new well would cost approximately $5223. Nevertheless, the jury returned a verdict awarding the Arrases $9700 compensation for the loss of water in the well.

■■ By virtue of Supreme Court Rule in Illinois, an appellate court may "give any judgment or make any order that ought to have been given or made and make any other and further orders and grant any relief, including a remandment, a partial reversal, the order of a partial new trial, the entry of a remittitur, or the issuance of execution, that the case may require." (Ill. Rev. Stat. 1975, ch. 110A, par. 366(a)(5); *Chicago City Ry. Co. v. Gemmill*, 209 Ill. 638, 71 N.E. 43.) Believing that the amount of the verdict is unsupported by the evidence in this case, we accordingly modify the judgment to $5223.

For the foregoing reasons the judgment of the circuit court of St. Clair is modified and, as modified, is affirmed.

*Affirmed as modified.*

CARTER, P. J., and JONES, J., concur.